# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ricardo Acosta, a/k/a Ricardo
Acosta Lucchesi,

        Petitioner,

    v.

Anne Marie Acosta, Susan Ellen
Campbell, and Stephen Alan
Campbell,

        Respondents.

_____

Susan Ellen Campbell, Stephen
Alan Campbell, and Anne Marie
Acosta,

        Counter Claimants,
v.

Ricardo Acosta,

        Counter Defendant.

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER FOR JUDGMENT**
Civil No. 12-342 ADM/SER

_____

Allison Maxim, Esq., and Nancy Zalusky Berg, Esq., Walling Berg & Debele, PA, Minneapolis, MN, on behalf of Ricardo Acosta.

Cyrus A. Morton, Esq., Daniel R. Burgess, Esq., and Andrea C. Yang, Esq., Robins Kaplan Miller & Ciresi LLP, on behalf of Anne Marie Acosta, Susan Ellen Campbell, and Stephen Alan Campbell.

_____

# I.  INTRODUCTION

The above-titled matter came before the undersigned United States District Judge for an evidentiary hearing on May 1 and May 2, 2012.  Petitioner Ricardo Acosta ("Ricardo") petitions for the return of his two minor children M.A.A. and E.T.A. to Peru under the authority of the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11611.  Ricardo alleges M.A.A. and E.T.A. were wrongfully retained in the United States by Respondent Anne Marie Acosta ("Anne") who was aided and abetted by her parents, Respondents Susan Ellen Campbell ("Susan Campbell") and Stephen Alan Campbell ("Stephen Campbell").  Respondents (Anne, Susan Campbell, and Stephen Campbell, collectively "Respondents") deny they wrongfully retained the children in the United States and allege affirmative defenses preclude returning the children to Peru if they were wrongfully retained.

During the two-day evidentiary hearing, the Court received evidence and heard testimony from nine witnesses.  The parties were represented by counsel.  Anne, Susan Campbell, and Stephen Campbell appeared in person.  Ricardo appeared telephonically from Peru.  Ricardo speaks English fluently, and was assisted from Peru by his retained English-speaking Peruvian attorney, Patricia Rojas Morales.

At the conclusion of the hearing, based on all the files, matters of record, and proceedings, the Court, for the reasons stated in open court and on the record, ruled: (1) that Ricardo had proven by a preponderance of evidence that the habitual residence of M.A.A. and E.T.A. at the time of their removal was Peru, Ricardo had custodial rights over M.A.A. and E.T.A. under the laws of Peru that he was actually exercising, and therefore the children have been wrongfully retained in the United States as defined by the Hague Convention; (2) that no

2

evidence supported a legal claim against Susan Campbell and Stephen Campbell, and they were

dismissed as parties; and (3) that Anne failed to meet her burden of proof with respect to both the

"well-settled defense" of Article 12 of the Hague Convention and the "fundamental human rights

defense" of Article 20 of the Hague Convention.

Therefore, at the close of the hearing, the only remaining issue was whether Anne had

proven by clear and convincing evidence that returning the children to Peru for a custody

determination would pose a grave risk of physical or psychological harm to each child or

otherwise place each child in an intolerable situation as contemplated by Article 13(b) of the

Hague Convention.

The Court allowed the parties to file additional memoranda limited to the issue of Anne's

Article 13(b) defense.  Each party was given leave to file an opening memorandum on or before

May 11, 2012, and a response to the other party's memorandum on or before May 16, 2012.

Having considered the evidence and arguments of counsel, the Court finds the Article 13(b)

defense applies and denies the Petition.

## II.  FINDINGS OF FACT[1]

**A.  The Parties**

1.  Ricardo is a citizen and resident of Peru.

2.  Anne is a citizen of the United States.  She presently resides in Ramsey County,

Minnesota.

---

[1]  To the extent that the Court's Conclusions of Law include what may be considered
Findings of Fact, they are incorporated herein by reference.

3.   Stephen and Susan Campbell are citizens of the United States and reside in Ramsey County, Minnesota.  Stephen and Susan Campbell are Anne's parents, and the grandparents of M.A.A. and E.T.A.

4.   Ricardo and Anne are the parents of two children: M.A.A., born February 6, 2003, and E.T.A., born August 23, 2007.

**B.  Marriage and Move to Peru**

5.   On November 26, 2002, Ricardo and Anne were married in Ramsey County, Minnesota.  Pet'r's Ex. 6.

6.   From November 2002 to July 2006, Anne and Ricardo lived together in the United States in the states of Minnesota and Wisconsin.

7.   M.A.A. was born in the United States on February 6, 2003.

8.   In July 2006, Anne, Ricardo, and M.A.A. moved to Lima, Peru.  Verified Pet. [Docket No. 1] ¶ 4.

9.   On August 23, 2007, E.T.A. was born in Lima, Peru, and resided there with her family.  Pet'r's Ex. 10.

10.   While in Peru, Anne worked as a teacher at el Colegio de Franklin Delano Roosevelt (the "Roosevelt School").  Ricardo was briefly employed there as well, but more recently worked at the Lima airport.  There was testimony that Ricardo also has income from illegally transporting electronics into Peru from the United States.

**C.  Early Incidents of Abusive Behavior**

11.  Anne testified that Ricardo was verbally abusive towards her throughout their marriage.  She testified that on at least one occasion Ricardo called her a "hippo" in the presence of M.A.A. and a "bitch" in the presence of E.T.A.

12.  Anne also testified that, prior to February 2011, Ricardo experienced several outbursts of violence which involved or were witnessed by his children.  Specifically, she testified that Ricardo pushed M.A.A. down onto a bed for insubordination.  She further testified that in about 2008 or 2009, Ricardo was driving the family car when he was cut off by a taxi. She testified that Ricardo: used the family car to force the taxi to a stop alongside the road's median, exited the car and assaulted the taxi driver, and broke the taxi's windshield with a theft-deterrent tool (the "Club") used to lock the family car's steering wheel, all observed by M.A.A. and E.T.A., who were passengers in the family car.

**D.  Retention of Children in the United States**

13.  In September 2010, Anne left Peru to attend a wedding in the United States.  M.A.A. and E.T.A. remained in Peru with Ricardo.  At the wedding, Anne expressed her fear of Ricardo to her mother, who counseled her to leave Peru, establish a "safe house" with a friend in Peru, and open a new email account for her own use.

14.  Ricardo acknowledged that around that time the couple was experiencing marital difficulties.  He testified that Anne's behavior was that of a single person–staying out late, drinking, cavorting with friends.  He resented that behavior and began sleeping in a separate room from Anne.  The couple also sought counseling.

15.  In November 2010, Anne told Ricardo she was going to Minnesota for the holidays with M.A.A. and E.T.A.  In prior years, Ricardo, Anne, and the children had all visited the

United States together for the Christmas-New Year's holiday season.  Stephen Campbell offered

to purchase Ricardo an air ticket to visit the United States again that year, but Ricardo refused

despite Stephen Campbell's urging.

16.  Anne had purchased airline tickets paid for by her father for her and the children to

leave Peru for the United States on December 23, 2010 and return on February 16, 2011.

Verified Pet. Ex. 3 (travel itinerary).

17.  After Anne, M.A.A., and E.T.A. left for Minnesota, Ricardo could not reach them by

telephone over the holiday period.  Anne, Susan Campbell, and Stephen Campbell would not

return Ricardo's calls, would offer excuses why the children could not talk, or would not answer

the phone.

18.  Sometime in early February 2011, Anne informed Ricardo that she would seek a

divorce and that M.A.A. and E.T.A. would not return to Peru on February 16, 2011 as planned.

**E.  February 13, 2011 Incident**

19.  Anne made plans to return to Peru from February 11, 2011 to February 16, 2011 to

retrieve her and her children's possessions.  See Resp't's Ex. 42.  On February 11, 2011, Anne,

accompanied by her brother Jeffrey Campbell, arrived in Lima.  Id.

20.  Concerned for their safety, Anne and Jeffrey Campbell asked several people to go

with them to the apartment she previously shared with Ricardo (the "Acosta apartment").

Elizabeth Norton LeBoo ("LeBoo"), Anne's colleague at the Roosevelt School, and Jacob

Johansen ("Johansen"), an acquaintance of Anne from a prior master's degree program that was

also employed by the Roosevelt School, volunteered to assist.

21.  On February 13, 2011, accompanied by Jeffrey Campbell, Leboo, and Johansen, Anne returned to the Acosta apartment.  While at the apartment, Anne telephoned Ricardo to tell him she was removing clothing and toys.

22.  With respect to the following series of events, the testimony of Anne, Jeffrey Campbell, and LeBoo was substantially similar and consistent.  They testified Ricardo returned to the apartment, crashing his car into a pole outside.  Ricardo then broke a window on the taxi they had taken to the apartment and which was awaiting their return.  Jeffrey Campbell and Johansen held the door of the apartment shut as Ricardo tried to enter the apartment.  Ricardo kicked the door to pieces and forced his way into the home.  Ricardo began throwing items at Anne.  Ricardo then grabbed a knife and chased the men while the women hid in a backroom.  Ricardo chased Johansen outside where Ricardo cut Johansen's leg with the knife.  Ricardo returned to the apartment and eventually forced his way into the backroom where he first battered LeBoo and then Anne.  Police arrived and, after passively watching the events for some time, restrained Ricardo.

23.  Ricardo's version of the events is entirely different.  He testified that it was Anne and her friends that broke doors in his house and "provoked" him.  Ricardo testified that Anne attacked him and then Jeffrey Campbell pushed him down and kicked him.  Ricardo testified that he did not hurt or attack Anne or LeBoo.  He also testified that they took $15,000.00 from the apartment.

24.  Ricardo's version of the events of February 13, 2011 is not credible.  His story was inconsistent and evolved as questioning proceeded.  For example, Ricardo testified that Jeffrey Campbell kicked him.  When asked earlier in a Peruvian television interview, Ricardo stated the

altercation did not "come to blows."[2]  Resp't's Ex. 60T at RTX060T-006.  Ricardo attempted to

explain this inconsistency by stating that kicking someone was not "coming to blows."

25.  LeBoo is a former teacher and colleague of Anne's at the Roosevelt School.  She

testified by telephone from Jakarta, Indonesia where she has lived since July 2011.  The

testimony of LeBoo was highly credible.  She closely corroborated details of Anne and Jeffrey

Campbell's testimony, and testified she had not discussed her testimony at all with anyone other

than to confirm that she would testify.  Moreover, LeBoo has no ongoing interest in the outcome

of this case and no longer lives in Peru.  LeBoo testified that during the events in the Acosta

apartment on February 13, 2011, she was "more terrified than I have ever been" and that she

continued to fear for her life for weeks after seeing the uncontrolled rage of Ricardo.  She did not

dare go anywhere unaccompanied in Lima for several weeks.

26.  The testimony of Jeffrey Campbell was also highly credible.  Jeffrey Campbell is

employed as a Security Engineering Officer for the U.S. State Department.  The U.S. State

Department has granted Jeffrey Campbell its highest level of security clearance.  Jeffrey

Campbell testified that when Anne called Ricardo from the apartment on February 13, 2011,

Jeffrey Campbell took the phone and engaged Ricardo in conversation.  Ricardo stated that he

loved his family and was going to kill himself.  Jeffrey Campbell pleaded for Ricardo not to kill

himself.  Jeffrey Campbell testified that after Ricardo arrived at the apartment, Ricardo grabbed

a knife from the kitchen counter and chased Johansen outside the apartment.  Jeffrey Campbell

then went to look for Anne and LeBoo.  While looking for Anne and LeBoo, Jeffrey Campbell

was corned in a hallway by Ricardo, holding out a knife.  Jeffrey Campbell testified that Ricardo

---

[2] The Spanish words used were "golpes," "te golpearon," and "los golpeaste."

looked like "an enraged doppelganger" of his former self.  Cornered in the hallway, with Ricardo

waving a large kitchen knife, Jeffrey Campbell begged Ricardo to spare his life.  Ultimately,

Ricardo did.

27.  As a result of the incident, Anne sustained injuries, including cuts to her hand

requiring stitches and bruises.  Resp't's Exs. 5–18, 20, 20T.

28.  In the midst of the melee at the apartment, Ricardo called Susan Campbell's cell

phone.  In a profanity-laced tirade, he threatened to kill Susan Campbell, Stephen Campbell,

Jeffrey Campbell, Anne, and Anne's sister.

29.  After leaving the apartment, Ricardo went to the police station while Anne, Jeffrey

Campbell, Johansen, and LeBoo went to the hospital and U.S. Embassy before arriving at the

police station.  At the police station, Ricardo was accompanied by several of his relatives.

LeBoo and Jeffrey Campbell testified that the police did not appear to take their version of the

events seriously.  Jeffrey Campbell testified that the Lima police would not allow Anne and her

supporters to leave the station because of concerns about their identification cards.  Jeffrey

Campbell testified they were eventually released when he offered cash to an officer as advised

by his Peruvian attorney.  Afterwards, a police report was issued that stated Ricardo had seen

Anne and "her lover" embracing.  Resp't's Exs. 36, 36T.  Ricardo testified first that it was a

mistranslation[3] and later that the police included those details on their own accord, and he did not

believe the man to be Anne's lover.  However, Ricardo repeated in a Peruvian television

interview that he did not know who the man was or "if that was her new boyfriend or God knows

---

[3] The original report references "su amante de mi esposa," "el amante de mi esposa," and
"su amante."  Resp't's Ex. 36 at RTX036-001.

what."  Resp't's Ex. 37T at RTX037T-003.  Regardless, all who testified–Ricardo, Anne, Jeffrey

Campbell, and LeBoo–agreed that Anne had not embraced any man while at the apartment.

**F.  Subsequent Events**

30.  After the incident, Ricardo called Rachel Metcalf Harrington ("Harrington"), the

principal at the Roosevelt School, and threatened to come to the Roosevelt School and kill Anne

with a knife.  Harrington, testifying telephonically from Peru, stated Ricardo has appeared in

television interviews near school property where he has blamed school officials for his problems

with obtaining custody of his children.  Harrington and the school staff assess the threat posed by

Ricardo as serious and have implemented an emergency protocol should he violate the ban on his

presence on school property.

31.  The night after the incident at the apartment, LeBoo testified a suspicious person

attempted to gain access to her home within a gated community by claiming to be her brother.

Her brother has never been to Peru.  LeBoo believes the person claiming to be her brother was

either Ricardo or someone acting at Ricardo's direction.

32.  Anne and Jeffrey Campbell had been scheduled to return to the United States on

February 16, 2011.  In the wake of the events of February 13 and Anne's injuries, they altered

their flight itineraries so that they left Peru the evening of February 14 and arrived in the United

States on February 15.  Upon her return to Minnesota, Anne was taken immediately by police

escort to Regions Hospital.  When reunited with M.A.A. and E.T.A., they viewed their mother's

obvious physical injuries.

33.  In the weeks after Anne's return from Peru, Ricardo made numerous calls to Stephen

Campbell and Susan Campbell.  He left threatening voicemails.  In one voicemail he states, "I'll

kill your kids, because she's [Anne is] taking my babies away.  And, I promise you, your

daughter is going to be killed because she is taking my kids away." Resp't's Ex. 2. He also spoke over the phone to both Stephen Campbell and Susan Campbell. In one live conversation with Susan Campbell, Ricardo threatened to kill M.A.A., E.T.A., and then himself.

34. On February 16, 2011, Anne met with officers from the Ramsey County Sheriff's Department, and a warrant was issued for Ricardo's arrest on February 18, 2011. Counter-Pet. [Docket No. 17] ¶ 28.

35. On March 2, 2011, Ricardo initiated an action for custody of M.A.A. and E.T.A. before a Peruvian court in Lima. Pet'r's Ex. 3.

36. On March 10, 2011, Anne filed a Petition for Dissolution of Marriage, in which she sought custody of M.A.A. and E.T.A., in Minnesota state court in Ramsey County. Verified Pet. Ex. 5. On November 3, 2011, that Petition was dismissed for lack of jurisdiction. Id. Ex. 6.

37. In May 2011, Ricardo traveled to Miami, Florida. Verified Counter-Pet. ¶ 31. Upon arrival, Ricardo was arrested. Id. He was eventually extradited to Minnesota.

38. On September 1, 2011, Ricardo pled guilty in Ramsey County, Minnesota to making terroristic threats in violation of Minn. Stat. § 609.713. Id. ¶ 32.

39. After his guilty plea, Ricardo returned to Peru to serve his probation. Visitation with M.A.A. and E.T.A. was arranged by use of the video-conferencing software Skype. The Skype visitation, however, stopped after one visit. Ricardo testified that he stopped the visitation because he preferred to explain what was occurring between him and Anne to his children in person.

**G. Mental Health of M.A.A.**

40. While living in Peru, M.A.A. was enrolled in school at the Roosevelt School. Teachers at the Roosevelt School noted M.A.A. had behavioral problems. Pet'r's Exs. 7, 8.

Harrington testified that M.A.A. told teachers he wanted to kill himself and he was referred to therapy. M.A.A. stopped therapy after two or three sessions because Ricardo felt the family could not afford it and because Ricardo felt, based on his own experiences, that therapy was ineffective. Harrington testified that in her nineteen years of experience as an educator, the severity of M.A.A.'s behavior problems stood out as one of the three most exceptional cases out of the thousands of students she has observed.

41. Stephen Campbell testified that after M.A.A. arrived in the United States in December 2010, Stephen Campbell noticed M.A.A. would have violent outbursts, wet his bed at night, and said he wished he were dead. Stephen Campbell further testified that M.A.A. is now in therapy and his demeanor has improved and bed-wetting has abated.

**H. Testimony of Dr. Edleson**

42. Dr. Jeffrey Edleson testified as an expert witness on behalf of Respondents. Dr. Edleson holds a Ph.D. from the University of Wisconsin–Madison School of Social Work, and is a tenured professor at the University of Minnesota–Twin Cities School of Social Work. Resp't's Ex. 48 at RTX0048-001. He testified that Ricardo's history of violence in the presence of others, escalation of violence, threats of suicide, and estrangement from his children were factors indicating a high risk of harm to M.A.A. and E.T.A were they to return to Peru.

43. Dr. Edleson further testified that M.A.A.'s antisocial behavior was consistent with exposure to domestic violence. See also Resp't's Ex. 52 at RTX052-009 (noting a child's exposure to domestic violence correlates with antisocial behavior, anxiety, depression, and temperament problems). Dr. Edleson testified he believed M.A.A. to be exhibiting signs of depression.

12

### I. Conditions in Peru

44. Ricardo testified that were the children returned to Peru, he and his family, many of whom live near by, would care for the children, and the family's former nanny would resume care of the children, as before when Anne and Ricardo lived together.

45. Services exist in Peru to protect and assist victims of domestic violence. Pet'r's Ex. 12 ¶¶ 5–6.

### III. CONCLUSIONS OF LAW

### A. Jurisdiction

46. This is an action arising under the Hague Convention, over which there is federal jurisdiction. 42 U.S.C. § 11603.

### B. Grave Risk of Harm Defense

47. Having already determined at the close of the evidentiary hearing that the children were wrongfully retained in the United States, as contemplated by the Hague Convention, and that no other affirmative defenses apply, and that Susan and Stephen Campbell are not liable under an aiding and abetting theory, the sole issue before the Court is whether the affirmative defense in Article 13(b) of the Hague Convention applies.

48. Under Article 13(b), the Court is not bound to order the return of either M.A.A. or E.T.A. if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b).

49. Anne bears the burden of establishing an Article 13(b) defense applies by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

50.   Exceptions to the Hague Convention, such as Article 13(b), are to be narrowly construed.  Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 376 (8th Cir. 1995).

51.   "There are two types of grave risk that are appropriate under Article 13(b): sending a child to a 'zone of war, famine, or disease,' or in cases of serious abuse or neglect."  Silverman v. Silverman, 338 F.3d 886, 900 (8th Cir. 2003) (quotation and citations omitted).  Anne does not argue Peru is a zone of war, famine, or disease, but rather focuses her argument on the grave risk of harm posed by serious abuse.

52.   A "grave risk" of physical or psychological harm requires an assessment of whether the child will face "immediate and substantial risk of an intolerable situation" if returned to his or her country of habitual residence.  Nunez-Escudero, 58 F.3d at 377.

53.   To meet her burden, Anne cannot rely on general evidence but must produce "specific evidence of potential harm."  Id. at 376 (quoting Rydder v. Rydder, 49 F.3d 369, 373 (8th Cir. 1995)).

54.   To prevail on an Article 13(b) defense, there must be evidence of a grave risk of harm to each child, not solely to a parent or some other third party.  Hague Convention art. 13(b); see also Nunez-Escudero, 58 F.3d at 378 ("[Respondent] must present clear and convincing evidence that the return of the child to [his country of habitual residence] would subject him to a grave risk of harm . . . .");  Charalambous v. Charalambous, 627 F.3d 462, 468 (1st Cir. 2010) ("The relevant inquiry is not whether there would be a grave risk of harm to [the child's mother] if she returned to [the country of habitual residence]; rather, the grave risk inquiry goes to the children.") (citation omitted).  However, where spousal abuse evinces a propensity towards violence and is accompanied by other risk factors specific to the child, a grave risk of harm to a child may be found.  See Baran v. Beaty, 526 F.3d 1340, 1346 (11th Cir.

14

2008) (upholding finding of grave risk to child where Petitioner physically and verbally abused

Respondent in addition to threatening to harm child, berating Respondent for hours in presence

of child on one occasion, and handling child irresponsibly while drunk); Van De Sande v. Van

De Sande, 431 F.3d 567, 570 (7th Cir. 2005) (reversing trial court's finding of no grave risk

where evidence showed Petitioner had a propensity for violence based on history of spousal

abuse and Petitioner beat and insulted Respondent in presence of children); Walsh v. Walsh, 221

F.3d 204, 220 (1st Cir. 2000) (finding grave risk where Petitioner had a history of disobeying

court orders, had an "uncontrollably violent temper," had battered his other children, fought

people younger than he, and based on the recognition of social science literature and law that

spousal abuse is linked to physical and psychological injury to children); see also Abbott v.

Abbott, 130 S.Ct. 1983, 1997 (2010) ("If . . . [Respondent] could demonstrate that returning to

[country of habitual residence] would put her own safety at grave risk, the court could consider

whether this is sufficient to show that the child too would suffer 'psychological harm' or be

placed 'in an intolerable situation.'") (citations omitted).

    55.  In determining whether a grave risk of harm to a child exists, courts may consider the

environment to which the child would be returning.  Nunez-Escudero, 58 F.3d at 377.  In so

doing, a court may consider both the resources in the country for dealing with domestic violence

and the people awaiting the child.  Id. at 377–78.

    56.  There is no requirement under the Hague Convention that a child actually have been

previously harmed physically or psychologically; rather, the relevant inquiry is whether

returning the child to the country of his habitual residence would present a grave risk of such

harm or otherwise place him in an intolerable situation.  Baran, 526 F.3d at 1346.

**C. Grave Risk of Harm Has Been Proven By Clear and Convincing Evidence**

57. Ricardo has an explosive temper and propensity to maintain a state of violent rage. The breaking of a taxi windshield and assault incident in 2008 or 2009 and the February 13, 2011 apartment melee demonstrate that Ricardo, once enraged, will engage in acts of violence that are severe and not limited to his spouse. The severity of Ricardo's temper is underlined by his beating and threats to Anne but even more remarkably by his use of a weapon on Johansen, a man he had never previously met and did not believe to be his wife's lover; his beating of his wife's colleague LeBoo; and his highly specific threats towards Anne, her family members, and his own children.

58. Ricardo's violent outbursts are not only severe, they are of a lasting duration. After leaving the police station on February 13, 2011, he or someone acting at his direction attempted to gain access to LeBoo's residence. He also called the Roosevelt School and made highly specific threats. For weeks after the February 13, 2011 incident, he continued to make threatening phone calls to Stephen and Susan Campbell.

59. The circumstances to which M.A.A. and E.T.A. would return in Peru pose a grave risk of physical harm to them. Ricardo's attempts to posit the February 13, 2011 incident as a situational reaction to the abduction of his children is unavailing. What appears to incite Ricardo's violence is the prospect of losing custody of his children. The evidence shows Ricardo does not have the emotional fortitude to acknowledge custody of his children may ultimately be with Anne. For example, in his voicemail message to Susan Campbell, he stated "I'll kill your kids, because she's taking my babies away. And, I promise you, your daughter is going to be killed because she is taking my kids away." Resp't's Ex. 2. Ricardo also testified he stopped Skype visitation with his children because he preferred to wait to talk to them in person.

Indeed, Ricardo's testimony regarding what would happen with the children should they be returned to Peru made no allowance whatsoever for any custodial arrangement other than the children returning to his care.  However, as Ricardo's own attorney in Peru acknowledges, children are typically placed with the parent with whom they are more accustomed to living, which could be the mother.  Pet'r's Ex. 12 ¶ 4.

60.  Given that Ricardo has commenced custody proceedings in Peru, and Anne seeks a divorce, Ricardo is highly unlikely to have the singular familial unit he desires.

61.  Dr. Edelson identified five high risk factors for future severe child abuse, including homicide.  All are present in this case including threats by Ricardo to kill himself and his children.

62.  This Court is concerned about the police response were Anne, M.A.A., or E.T.A. to be in future physical danger from Ricardo.  In light of the local police officers' slow response on February 13, 2011, the requirement to be paid cash prior to allowing the release of Anne and her friends from the police station where they had gone to report a crime, the filing of a false police report, and Ricardo's apparent influence over certain officers,[4] the risk of harm to Anne, M.A.A., E.T.A. is exacerbated.

63.  A grave risk of physical harm to M.A.A. and E.T.A. exists should they be returned to Peru.

64.  A grave risk of psychological harm is also present for M.A.A. and E.T.A.  M.A.A. has exhibited some behavior indicative of psychological harm.  In light of Harrington's

---

[4] The precise source of Ricardo's influence over certain local officers is unknown.  His aunt Marina Acosta testified, however, that Ricardo's family are members of a country club along with local police.

testimony of M.A.A.'s behavior before leaving Peru, the Court is firmly convinced that

M.A.A.'s psychological harm is not the result of his removal from Peru, as urged by Ricardo, but

rather is attributable to the stress of his family life.  Although no clinical diagnosis exists for

M.A.A., and no evidence suggests E.T.A. has suffered psychological harm, there is no

requirement that psychological harm have actually occurred.  Baran, 526 F.3d at 1346.  It is

sufficient that a grave risk exists.  Id.

65.  Should the children be required to return to Peru, it is highly probable that Ricardo

will react with violence, threats, or other verbal abuse towards the children, Anne, or others.

Ricardo has already evinced a disregard for protecting his children from exposure to his temper.

Therefore, a grave risk of psychological harm to both M.A.A. and E.T.A. exists should they be

returned to Peru.

66.  Therefore, the Court finds by clear and convincing evidence that M.A.A. and E.T.A.,

if returned to Peru, would face an immediate and substantial risk of an intolerable situation.

## IV.  ORDER FOR JUDGMENT

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that Ricardo's Verified Petition for Return of Children to Petitioner and

Petition for Immediate Issuance of Show Cause Order to Respondents [Docket No. 1] is

**DENIED** and Anne's Counter-Petition [Docket No. 17] is **GRANTED in part** insofar as it

seeks denial of Ricardo's Petition on the grounds that returning the children to Peru would put

M.A.A. and E.T.A. at a grave risk of physical and psychological harm or otherwise place them in

an intolerable situation.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 14, 2012.